IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>CROCKER COMPANIES, INC., dba CITY TITLE INSURANCE AGENCY dba CITY TITLE INSURANCE BROKERAGE,<br><br>    Debtor. | |
| STEPHEN W. RUPP, TRUSTEE OF THE BANKRUPTCY ESTATE OF CROCKER COMPANIES, INC. and R. KIMBALL MOSIER, TRUSTEE OF THE BANKRUPTCY ESTATE OF EMPIRE INVESTMENT GROUP, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN MAYBERRY,<br>Defendant. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br><br><br>Case No. 2:05-CV-599 TS |
| KEVIN MAYBERRY,<br><br>    Third-Party Plaintiff,<br><br>        vs.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, ROBERT LOPEZ and PAUL NORAT,<br>    Third-Party Defendants. | |

On October 29, 2007, the Court heard oral argument on cross motions for summary judgment and the Third-Party Defendants' Motion to Dismiss.  Having considered the briefs, the arguments of counsel, and being otherwise fully informed, the Court will: deny Plaintiff's Motion for Remand; grant in part and deny in part Trustee's Motion to Strike; grant in part and deny in part Plaintiff's Motion for Summary Judgment; grant in part and deny in part Defendant's Motion for Summary Judgment; and grant the Third-Party Defendants' Motion to Dismiss.

## I.  UNDISPUTED FACTS

The facts of this case are largely undisputed.  Crocker Companies, Inc. ("Crocker Companies") was incorporated as a Utah corporation in 1989.  Since its incorporation, Billie Crocker has been the President and sole shareholder of Crocker Companies.  Prior to its bankruptcy, Crocker Companies provided legal and title insurance services.  Its title insurance services were conducted under the d/b/a of City Title.

In approximately October 1998, Crocker Companies d/b/a City Title opened a checking account at Bank One (the "Bank One Account").  Since the time it was opened, City Title has been listed as the owner of the Bank One Account.

In approximately 1999, City Title opened a "high balance" savings account at Bank One (the "Savings Account").  Crocker Companies deposited approximately $10,000 in the Savings Account when it was opened.  Since the time it was opened, City Title has been listed as the owner of the Savings Account.

From approximately 1999 to approximately the Fall of 2002, Crocker Companies directed the transfer of the funds held in the Bank One Account into the Savings Account

approximately 2-4 times per month.  In the Fall of 2002, Crocker Companies arranged for the funds from the Bank One Account to automatically be swept into an investment account at the end of each day.  The funds would then be swept back into the Bank One Account at the start of each business day.  The earnings from the investment account were not allocated to a specific depositor or investor, but were instead used to pay certain operating expenses.  Additionally, between February 1, 2002, and February 28, 2003, Crocker Companies deposited over $350,000 of its own funds in the Bank One Account.

Billie Crocker met Wayne "Reed" Ogden in approximately July of 2002.  Ogden was an agent of Empire Investment Group, LLC ("Empire").  Empire was a real estate investment company that purchased properties and quickly resold them at substantial profits.  Empire planned to acquire and develop a property in Kiowa, Colorado (the "Kiowa Property").  Ogden was engaged in locating various lenders and investors for the acquisition and development of the Kiowa Property.  Ogden told these lenders and investors to deposit their funds with City Title into the Bank One Account.

Ogden contacted J.I. Holdings, Inc. and asked J.I. Holdings to act as a loan broker in locating potential lenders for the development of the Kiowa Property.  J.I. Holdings was represented by Mark Hufstedler, Robert Lopez, and Paul Norat in connection with the Empire and Kiowa Property transactions.  J.I. Holdings was the loan broker that arranged for the deposit of Mayberry's $300,000 deposit into the Bank One Account.

Paul Norat contacted Mayberry and asked him to deposit $300,000 in the Bank One Account.  Mayberry agreed to do so.  On November 26, 2002, Robert Lopez and Mayberry visited Billie Crocker at City Title's office.  Lopez and Mayberry presented Billie Crocker with Escrow Instructions which were signed by Billie Crocker on behalf of City Title.

The Escrow Instructions were addressed to "Billie Crocker City Title" and to "Fidelity National Title Insurance Company."  The Instructions state that "J.I. Holdings is funding a loan to Empire Investment Group" in the amount of $630,000.  The Instructions list J.I. Holdings and Mayberry as the Lender to Empire.

The Instructions further state:

Instructions are as follows: $300,000 is to be wired today, $100,000 will be wired Monday 12/02/2002; the $400,000.00 is to be held in escrow and shall not be released under any circumstances except to Lender*; the $400,000.00 held in escrow shall be returned to Lender no later than 12/12/2002, plus $230,000.00 for a total of $630,000.00.

Lender agrees to convey title to the above properties upon receipt of full payment of $630,000.00.

If on 12/12/2002 the total amount of $630,000.00 is not returned, on 12/13/2002 the $400,000.00 held in escrow will be returned to Lender and Lender will retain the above 2 properties as payment in full.  *$300,00 to be returned to Kevin Mayberry.  $100,000 to JI Holding[s] Inc.

If the total of $630,00[0].00 is repaid by 12/12/2002 City Title will record two Quit Claim Deeds conveying the above properties back to the original owner.

Lender reserves the right to withdraw any portion of the $400,000 at any time and thereby cancel this transaction.  *$300,000 by Kevin Mayberry.  $100,000 by JI Holdings, Inc.

Mayberry wired $300,000 from the Wells Fargo Bank Account of Kevin L. Mayberry and Lisa L. Mayberry on November 26, 2002, to the Bank One Account.  J.I. Holdings signed a Promissory Note payable to Mayberry, promising to repay Mayberry the amount of his $300,000 deposit, plus $30,000.  Paul Norat and Robert Lopez guaranteed the payment by J.I. Holdings to Mayberry of the Mayberry deposit of $300,000, plus the additional payment of $30,000.

Mayberry's $300,000 was supposed to have been paid back on December 12, 2002.  Mayberry agreed to extend that time to December 19, 2002.  Billie Crocker received a request

from Empire to prepare a disbursement authorization to be signed by Empire verifying Empire's approval for City Title to disburse Mayberry's $300,000 back to Mayberry.  Billie Crocker prepared the disbursement authorization, which states in part: "Empire hereby authorizes City Title to disburse $300,000 to Mayberry upon receipt of replacement funds from J.I. Holdings."

Billie Crocker understood that there was an agreement between Empire and J.I. Holdings that an additional $300,000 would be deposited in the Bank One Account.  On December 20, 2002, Steve Blaser, on behalf of the Blaser Family Limited Partnership, wired $300,000 to the Bank One Account.[1]  Robert Lopez of J.I. Holdings told Billie Crocker that Blaser's funds were a replacement for Mayberry's funds.

On December 20, 2002, Mayberry received $300,000 in a check made payable to him ("Check No. 1683") drawn on the Bank One Account.  Mayberry deposited Check No. 1683 with Wells Fargo Bank on December 20, 2002.  The check cleared on December 23, 2002.

On December 20, 2002, Billie Crocker prepared and signed Check No. 1685, drawn on the Bank One Account in the amount of $60,000 payable to J.I. Holdings, Inc.  J.I. Holdings did not have a checking account at the time.  J.I. Holdings endorsed the back of the check payable to the order of Capital Construction.  Capital Construction was a company controlled by Robert Lopez, who also worked for or with J.I. Holding.  J.I. Holdings instructed Robert Lopez to pay $30,000 to Mayberry through a check drawn on Capital Construction's bank account.  Robert

---

[1]Blaser presented Crocker with a letter with the following instructions: "You will be receiving $300,000 from Blaser Family Limited Partnership.  This money is to be held in escrow and shall not be released under any circumstances, except to Blaser Family Limited Partnership. The $300,000 shall be returned to Blaser Family Limited Partnership no later than 1/15/2003." Blaser's $300,000 was never returned.

Lopez caused Capital Construction to pay Mayberry $30,000 through a Capital Construction check.

This case was commenced by the filing of an involuntary petition under Chapter 7 of the Bankruptcy Code on February 19, 2003.

## II.  MOTION FOR REMAND

The Trustee seeks to partially remand this case to the Bankruptcy Court.  Defendant and Third-Party Plaintiff Mayberry and the Third-Party Defendants oppose this Motion.  For the reasons set forth in the Court's Order Granting Defendant's Motion to Withdraw Reference[2] and in the interest of judicial economy, the Court will deny the Trustee's Motion for Remand.

## III.  MOTION TO STRIKE

The Trustee moves to strike Paragraphs 5, 7, 8, 9, and 10 of the Affidavit of Douglas M. Monson.  The Trustee's primary argument is that this paragraphs contain Mr. Monson's legal opinions and that those opinions should be stricken.  The Court will disregard those portions of Mr. Monson's affidavit which state legal conclusions.  However, the Court will not strike these paragraphs as a whole.  Therefore, the Trustee's Motion will be granted in part and denied in part.

## IV. SUMMARY JUDGMENT

The Trustee argues that the transfer to Mayberry of $300,000 and $30,000 were preferential transfers pursuant to Section 547(b) of the Bankruptcy Code.  The Trustee further argues that the transfer to Mayberry of $30,000 was a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code and Utah Code Ann. § 25-6-5(1)(b).

---

[2]Docket No. 9.

Defendant Mayberry argues that the funds he received had been held in trust in the Bank One Account and, thus, were not the property of the bankruptcy estate.  If the Bank One Account lost its trust character, however, Mayberry argues that he can trace his $300,000 under the lowest intermediate balance test.  Defendant Mayberry also asserts that the contemporaneous deposit of Blaser's $300,000 protects these funds from the Trustee's preference claim under the earmarking doctrine and under 11 U.S.C. § 547(c)(1).  Mayberry further argues that the transfer of the $30,000 was not a preferential or fraudulent transfer.

A.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[3]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[4]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[5]

B.      THE $300,000

The Trustee seeks to recover the $300,000 paid to Mayberry under a preferential transfer theory.  "Under the terms of § 547, a transfer is avoidable if it: (1) is of an interest of the debtor in property; (2) is for the benefit of a creditor; (3) is made for or on account of an antecedent debt

---

[3]*See* Fed. R. Civ. P. 56(c).

[4]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[5]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

owed by the debtor before the transfer was made; (4) is made while the debtor is insolvent; (5) is made on or within ninety days before the date the bankruptcy petition was filed; and (6) allows the creditor to receive more than the creditor would otherwise be entitled to receive from the bankruptcy estate."[6]  Elements four, five, and six are not in dispute here.  Thus, the Court is left to discuss the first three elements.

     *1.      Property of the Debtor*

     The parties agree that "[p]roperty subject to a trust is not property of the bankruptcy estate."[7]  However, "where the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property."[8]  Here, it is undisputed that commingling has occurred.[9]  The circumstances surrounding the Bank One Account further support this conclusion.  As noted above, Crocker Companies initially deposited $10,000 into the

---

     [6]*Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190,1196 (10th Cir. 2002) (citing 11 U.S.C. § 547(b)).

     [7]*Hill v. Kinzler (In re Foster)*, 275 F.3d 924, 926 (10th Cir. 2001).  *See also Research-Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.)*, 917 F.2d 424, 426 (10th Cir. 1990) (en banc) ("By definition, property held by the debtor in trust is not part of the bankruptcy estate.").

     [8]*In re Hedged-Investment Associates, Inc.*, 48 F.3d 470, 474 (10th Cir. 1995).  *See also Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1218 (9th Cir. 1988) ("[E]ven if an express trust were created, [Defendant] would still have a duty under federal bankruptcy law to trace his funds to the [property] he received.  Such a tracing requirement is necessary to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors."); *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999) (holding that federal bankruptcy law requires beneficiary of trust funds deposited into commingled account to trace funds to retain his property over unsecured creditors).

     [9]*Compare* Docket No. 39, at ¶ 30 ("The funds deposited by Crocker Companies were commingled with the other funds held in the Bank One Checking Account.") *with* Docket No. 64, at ¶ 30 ("RESPONSE: <u>Admit</u>.  Such commingling is permitted pursuant to <u>Utah Code Ann</u>. §§ 31A-23a-406(1) and 31A-23a-409(1)(b).").

8

Savings Account.  Crocker Companies directed the transfer of the funds held in the Bank One

Account into the Savings Account approximately 2-4 times per month.  Crocker Companies

arranged for the funds from the Bank One Account to be automatically swept into an investment

account at the end of each day and swept back into the account at the beginning of each day.  The

earnings from the investment account were not allocated to a specific individual, but were used

to pay certain operating expenses.  Further, $350,000 of Crocker Company funds were placed

into the Bank One Account.  Finally, investors in the Kiowa Property were told to deposit their

funds with City Title into the Bank One Account.

Mayberry argues that this commingling was not unlawful or even inappropriate, but this

is irrelevant.  Bankruptcy law does not require that the commingling be unlawful or

inappropriate, only that it occur.  If commingling does occur, then Mayberry must be able to

trace his funds in order to maintain his property.  Additionally, Mayberry asserts that under the

Trustee's reasoning, a separate account would be required for each investor.  Again, this

argument misses the point.  What is relevant here is that if commingling occurs, which it has,

then the tracing requirement is called into play.

Mayberry argues that he can trace his funds under the lowest intermediate balance test.

The Tenth Circuit has described the lowest intermediate balance rule as follows.

> The lowest intermediate balance rule permits a claimant to trace trust funds
> deposited into a general account.  Under this rule, any funds removed from the
> account are presumed to be the debtor's personal funds to the extent these funds
> exceeded the beneficiary's equitable interest.  Although new deposits are not
> subject to the equitable claim of the trust beneficiary, subsequent withdrawals are
> presumed to draw first upon the new funds.  Applying the rule, the constructive
> trust beneficiary may retrieve the lowest balance recorded after the funds were
> commingled.[10]

---

[10]*In re Foster*, 275 F.3d at 927 (citations omitted).

Here, Mayberry argues that because the lowest intermediate balance in the Bank One Account never fell below $300,000 from the time he deposited his money into the Bank One Account until his money was returned, he has traced his funds and the Trustee may not recover those funds.  The Trustee argues that the lowest intermediate balance test should not be applied here for equitable reasons.

Recently, the Tenth Circuit warned that "[t]he lowest intermediate balance rule is an equitable fiction that should not be employed where equity does not warrant the result."[11]  Courts have refused to employ the lowest intermediate balance test "where the commingled account is comprised largely of funds acquired from other fraud victims."[12]

Here, the escrow account was made up of funds receive from various other investors in the Kiowa Property.  If the Trustee were not allowed to recover the transfer to Mayberry, Mayberry would receive 100% of his investment while others who are similarly-situated would receive nowhere near that amount.  Such a result would be inequitable.  "A tracing fiction should not be employed to elevate [Mayberry's] claims over the claims of other creditors if those creditors are similarly situated."[13]  Mayberry argues that he is not similarly situated to other creditors because he provided specific escrow instructions to Crocker and those instructions were followed.  Other investors, such as Blaser, also provided escrow instructions.  It is inequitable for Mayberry to receive more funds than other similarly situated investors simply because he was able to get his investment back before the funds ran out.

---

[11] *Id.*

[12] *Id.*

[13] *Id.* at 928.

For these reasons, the Court will not employ the intermediate balance test here.

*2.        Creditor and Antecedent Debt*

Mayberry also argues that as an owner of funds held in trust, he is not a creditor.  A creditor is an entity that has a claim against the debtor.[14]  A claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[15]  Here, Mayberry became a creditor when he deposited his $300,000 into the Bank One Account.  It was at that time that he had a right to demand repayment of that money and, thus, had a claim.

Antecedent debt is not defined by the Bankruptcy Code.  "The term 'debt' means liability on a claim."[16]  "The terms 'debt' and 'claim' are coextensive.  When a creditor has a claim against the debtor, the debtor owes a debt to the creditor."[17]  Thus, when Mayberry deposited his funds into the account, he accrued a claim against Crocker and Crocker owed him a debt.  Thus, the subsequent transfer of funds to Mayberry was on account of an antecedent debt.

As a result of these conclusions, the Court finds that the transfer by the debtor to Mayberry of $300,000 was a preferential transfer and may be avoided by the Trustee unless an exception exists.

---

[14] 11 U.S.C. § 101(10)(A).

[15] *Id*. § 101(5)(A).

[16] *Id*. § 101(12).

[17] *In re Bullion Reserve of North Am.*, 836 F.2d at 1219.

3.      *Earmarking Doctrine*

Mayberry argues that the earmarking doctrine should apply as a result of a transfer of $300,000 from Steve Blaser, on behalf of the Blaser Family Limited Partnership, to the Bank One Account.  As noted above, on November 26, 2002, Mayberry deposited his $300,000 in the Bank One Account.  Mayberry asked for a return of his money on December 19, 2002, and was given a check for $300,000 the following day.  On December 19, 2002, Steve Blaser, on behalf of the Blaser Family Limited Partnership, transferred $300,000 to the Bank One Account.  At the time, Blaser and the Blaser Family Limited Partnership did not know Mayberry, had no dealings with him, and did not owe him any money.[18]  Blaser has stated that he did not intend for the $300,000 he transferred to the Bank One Account to be replacement funds for the money deposited by Mayberry.[19]

"'Earmarking' is a judicially-created doctrine said to apply when a new creditor pays a debtor's existing debt to an old creditor."[20]  "Under this legal fiction, the payment of debt by the new creditor on debt owed by debtor is not considered the transfer of property of the estate."[21] "The earmarking doctrine was created to deal with the injustice resulting where the new creditor

---

[18]Docket No. 73.

[19]*Id.*

[20]*Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641, 645 (10th Cir. BAP 2000).

[21]*Loveridge v. The Ark of Little Cottonwood, Inc.*, 343 B.R. 685, 688 (Bankr. D. Utah 2005).

was independently obligated to pay the debtor's debt, and thus was required to pay the debt a second time after the original payment was avoided as a preference."[22]

This doctrine generally arises in co-debtor cases where "the new creditor, who was obligated on an existing debt as a guarantor or surety, provided the debtor with funds to pay the old creditor."[23]  Mayberry argues that this is in fact a co-debtor situation, but the Court concludes that this is not the case.  There is no allegation that Blaser, as the new creditor, was obligated to pay the prior debt.  The situation may have been different if Robert Lopez would have provided the new funds, but these are not the facts before the Court.

The earmarking doctrine has been "extended 'to situations where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor.'"[24]  "This extension of the doctrine has been subject to attack."[25]

The Tenth Circuit has not ruled directly on the issue of whether the earmarking doctrine should be applied beyond co-debtor cases, but the Bankruptcy Appellate Panel ("BAP") did address the issue in *Manchester v. First Bank & Trust Co. (In re Moses)*.  In that case, the BAP found that the earmarking doctrine should not be extended beyond co-debtor cases.[26]  The Court finds the reasoning set out in *Moses* to be persuasive.  For the reasons stated in that case, the earmarking doctrine is inapplicable here.

---

[22]*Id*. at 688–89.

[23]*In re Moses*, 256 B.R. at 645.

[24]*Id*. (quoting *McCuskey v. Nat'l Bank (In re Bohlen Enters., Ltd.)*, 859 F.3d 561, 566 (8th Cir. 1988)).

[25]*Id*.

[26]*Id*. at 646–47.

13

Further, even if the doctrine were applicable, none of the three tests discussed in *In re Moses* are met here.  Under the "intent test," three elements must be met: (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; and (3) the transaction viewed as a whole does not result in any diminution of the estate.[27]  Under the "control test," the earmarking doctrine applies if the debtor lacked control over the funds supplied by the new creditor.[28]  "In determining control, courts typically consider whether the new creditor restricted the use of the funds, whether the debtor had physical control over the funds, and whether the debtor had the ability to direct to whom the funds should be paid."[29]  Under the "diminution of estate" test, the issue is whether the estate was diminished by the transfer.[30]

Here, both the intent test and the diminution of estate test fail because the transfer to Mayberry resulted in a diminution of the estate because it resulted in $300,000 less for the other creditors to share. Further, the intent test has not been met because there was no agreement between Blaser and Crocker that the new funds were to be used to pay Mayberry.  Finally, the control test cannot be met because of the escrow instructions given to Billie Crocker by Blaser.

For the reasons discussed above, the earmarking doctrine is inapplicable here.  Even if it could be applied, Mayberry has failed to meet the elements of the various tests set forth above.

---

[27]*Id*. at 649.

[28]*Id*. at 650.

[29]*Id*.

[30]*Id*.

4.      *Exceptions to § 547(b)*

Mayberry also contends that the transfer cannot be set aside because it was a

contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1).  Section 547(c)(1)

provides:

> (c) The trustee may not avoid under this section a transfer--
> (1) to the extent that such transfer was--
> (A) intended by the debtor and the creditor to or for whose benefit such transfer
> was made to be a contemporaneous exchange for new value given to the debtor;
> and
> (B) in fact a substantially contemporaneous exchange.[31]

Section 547(a)(2) defines "new value" as

> money or money's worth in goods, services, or new credit, or release by a
> transferee of property previously transferred to such transferee in a transaction
> that is neither void nor voidable by the . . . trustee under any applicable law . . .
> but does not include an obligation substituted for an existing obligation.[32]

In this case, Mayberry argues that the $300,000 provided by Blaser was a

contemporaneous exchange for new value.  Crocker prepared a check for Mayberry for $300,000

on December 19, 2002.  Crocker did so in anticipation of receiving replacement funds.  Crocker

received $300,000 from Blaser on December 20, 2002.  Crocker had been told by Robert Lopez

that Blaser's funds were replacement funds for Mayberry's funds.  Mayberry then received a

check from Crocker for his $300,000 on December 20, 2002.

This case is complicated somewhat by the fact that Mayberry was not the person who

provided the new value to Crocker Companies.  "In the typical § 547(c)(1) case, new value is

provided by the creditor who received the transfer from the debtor—the debtor transfers property

---

[31]11 U.S.C. § 547(c).

[32]*Id.* § 547(a)(2).

to the creditor, and the creditor provides new value to the debtor."[33]  It is undisputed that Mayberry did not provide new value to Crocker.  Mayberry argues, however, that a third-party, Blaser, did provide new value.

"There is nothing in § 547(c)(1) requiring the transferee-creditor to provide new value."[34] Courts have recognized that a transfer or new value by a third party to the debtor may satisfy the new value requirement of § 547(c)(1).[35]  Here, Blaser did provide new value, in the form of $300,000, which was given to Crocker Companies by Blaser.

Next it must determined whether Crocker Companies and Mayberry intended the transfer to Mayberry to be a contemporaneous exchange for this new value provided by Blaser as required by § 547(c)(1)(A).  Here, as in *In re Moses*, there is no evidence of this intent.[36]  While Robert Lopez may have had this intention and Billie Crocker may have been aware of that intention, there is no evidence of any agreement between Crocker and Mayberry concerning the new value.  Further, the escrow instructions provided by Blaser disprove that Crocker and Mayberry intended the transfer from Blaser be a contemporaneous exchange.  Thus, Section 547(c)(1) does not apply here.

---

[33]*In re Moses*, 256 B.R. at 652.

[34]*Id*.

[35]*See id.  See also Jones Truck Lines, Inc. v. Central States, Southeast, and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323 (8th Cir. 1997) (collecting cases).

[36]*Moses*, 256 B.R. at 653.

C.      THE $30,000

The Trustee also seeks to recover the $30,000 paid to Mayberry from Capital

Construction pursuant to a preferential or fraudulent transfer theory and under Section 550 of the

Bankruptcy Code.  Under Section 550, in order to recover the $30,000, Mayberry must be an

"initial transferee" or an immediate or mediate transferee of the initial transferee.  The Trustee

argues that Mayberry was an initial transferee.  Mayberry argues J.I. Holdings was the initial

transferee.  Mayberry further argues that he was a transferee who took for value, including

satisfaction of a present debt from J.I. holdings, in good faith, and without knowledge of the

voidability of the transfer and, thus, the Trustee cannot recover under § 550(b).  The Trustee has

not argued that Mayberry was an immediate or mediate transferee of an initial transferee under §

550(a)(2).

Section 550(a) of the Bankruptcy Code allows the trustee to "recover, for the benefit of

the estate, the property transferred, or, if the court so orders, the value of such property,

from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was

made; or (2) any immediate or mediate transferee of such initial transferee."[37]

The Tenth Circuit has adopted a "dominion and control test" to determine whether an

entity is an "initial transferee."[38]  "Under that test, 'the minimum requirement of status as a

transferee [under § 550] is dominion over the money or asset, the right to put the money to one's

---

[37]11 U.S.C. § 550(a).

[38]*Bailey v. Big Sky Motors, Ltd. (In re Odgen)*, 314 F.3d 1190, 1202 (10th Cir. 2002).

own purposes.'"[39]  "Under this approach, 'those who act as mere 'financial intermediaries,' conduits' or 'couriers' are not initial transferees under § 550.'"[40]

Here, Crocker Companies disbursed $60,000 to J.I. Holdings.  J.I. Holdings then distributed those funds to Capital Construction, an entity controlled by Robert Lopez.  J.I. Holdings instructed Capital Construction to distribute $30,000 of those funds to Mayberry.  The Trustee argues, based on the deposition of Robert Lopez, that Mayberry was an initial transferee because Capital Construction did not have dominion and control over the $60,000 because it did not have the right to put the $60,000 to its own purposes.  The Trustee's argument misses the point.  The $60,000 was originally distributed to J.I. Holdings.  J.I. Holdings had dominion and control over those funds.  J.I. Holdings had the ability to put those funds to its own use and, in fact, did so.  J.I. Holdings used that money, through Capital Construction, to pay a debt that it owed to Mayberry.  This clearly shows that J.I. Holdings had dominion and control over those funds and was, therefore, the initial transferee of these funds.  As Mayberry was not an initial transferee, the Trustee cannot recover the $30,000 paid to Mayberry.

For the reasons set forth above, the Court will grant in part and deny in part the Trustee's Motion for Summary Judgment and Defendant's Motion for Summary.  The transfer of the $300,000 was a preferential transfer and may be recovered by the Trustee.  However, Mayberry was not the initial transferee of the $30,000.  Therefore, the Trustee may not recover that amount under Section 550.

---

[39]*Id.* (quoting *Bonded Financial Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

[40]*Id.* (quoting *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996)).

## V.  MOTION TO DISMISS

Defendant and Third-Party Plaintiff Kevin Mayberry has filed an Amended Third-Party Complaint against Fidelity National Title Insurance Company, Robert Lopez, and Paul Norat. The Third-Party Complaint is essentially an indemnity action brought by Mayberry against the Third-Party Defendant in the event that the Trustee is able to avoid the transfer of $300,000 to Mayberry.  The Third-Party Defendants Lopez and Norat seek dismissal of the Amended Third-Party Complaint arguing that the Court lacks subject matter jurisdiction.  Alternatively, the Third-Party Defendants argue that the Court should abstain from hearing the Third-Party Complaint pursuant to 28 U.S.C. § 1334 or should dismiss the Complaint for failure to state a claim.

The Court has original but not exclusive jurisdiction over civil proceedings arising under Title 11, or arising in or related to cases under Title 11.[41]  "'[T]he test for determining whether a civil proceeding is related in bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"[42]  "Although the proceeding need not be against the debtor or his property, the proceeding is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedoms of action in any way, thereby impacting on the handling and administration of the bankruptcy estate."[43]

---

[41]28 U.S.C. § 1334(b).

[42]*Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

[43]*Id.*

This case is factually similar to *In re John Peterson Motors, Inc.*[44]  In that case, the debtor was an automobile dealership.[45]  An examiner was appointed and brought an adversary proceeding against Borreson seeking to recover allegedly preferential payments.[46]  Borreson then filed a third-party complaint against the owner of the dealership individually, seeking indemnification.[47] The court, utilizing the *Pacor* test, held that it lacked jurisdiction under 28 U.S.C. § 1334(b).[48]  The court stated:

> The dispute is between two non-debtors over who should be ultimately responsible for sums recovered from Borreson in the main action.  As it stands, the trustee will recover preferences from Borreson or he will not.  If the trustee prevails, Borreson will seek reimbursement from Peterson.  The third-party action will have no bearing on whether or to what extent the estate recovers allegedly preferential payments.  Thus, even under this liberal test, Borreson's third-party complaint is not a related proceedings and therefore falls outside of the jurisdictional grant of 28 U.S.C. § 1334.[49]

Similarly here, the Trustee will either be able to recover the $300,000 from Mayberry or he will not.  If he can, then Mayberry may have a cause of action against the Third-Party Defendants for reimbursement of those funds.  That action, however, will not have any effect on the estate being administered in bankruptcy.  Mayberry's arguments that this action is related to the bankruptcy estate are unavailing.

---

[44]56 B.R. 588 (Bankr. D. Minn. 1986).

[45]*Id*. at 590.

[46]*Id*.

[47]*Id*.

[48]*Id*. at 590–91.

[49]*Id*. at 591.

Mayberry argues that even if the Court does not have "related to" jurisdiction, jurisdiction is proper under 28 U.S.C. § 1367.  However, because the Court has resolved the federal claims on summary judgment, the Court will decline supplemental jurisdiction over Mayberry's state law claims pursuant to 28 U.S.C. § 1367(c)(3).

## VI.  CONCLUSION

It is therefore

ORDERED that Plaintiff's Motion for Remand (Docket No. 80) is DENIED.  It is further

ORDERED that Plaintiff's Motion to Strike (Docket No. 67) is GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 38) is GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 63) is GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Third-Party Defendants' Motion to Dismiss (Docket No. 51) is GRANTED and the Amended Third-Party Complaint is dismissed without prejudice.

The Clerk of the Court is directed to enter judgment for Plaintiff and against Defendant in the amount of $300,000 and close this case forthwith.

DATED   November 8, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge